UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ERICA KOMMURI,<br>Plaintiff,<br>v.<br>APPLE INC., a California Corporation,<br>Defendant. | No. _________________________<br>**CIVIL COMPLAINT**<br>**JURY TRIAL DEMANDED** |


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

Plaintiff Erica Kommuri, by and through her attorneys, alleges the following upon personal knowledge and belief, and investigation of counsel:

## NATURE OF THE ACTION

1. Plaintiff brings this action against Defendant Apple Inc. ("Apple") for the severe, foreseeable injuries sustained when an Apple AirTag was illicitly and surreptitiously used to track, monitor, and map her real-time physical location without her knowledge or consent, in violation of Washington law. Apple designed, manufactured, marketed, and distributed AirTags despite knowing the devices lacked the safeguards necessary to prevent, detect, or alert individuals from unwanted tracking, surveillance, and stalking. By exploiting its global, one-billion-device "Find My" network into a low-cost surveillance infrastructure, Apple made the non-consensual surveillance, stalking, and abuse of Plaintiff an inevitable result of its product design. Specifically, Apple's defective architecture facilitated a direct violation of Washington's criminal cyberstalking statute, RCW 9A.90.130, and physical stalking statute, RCW 9A.46.110, which strictly outlaw the unauthorized installation and use of electronic tracking devices. As a direct and proximate consequence of these inherent design defects, from no later than May 2024 through at least October 2024, Plaintiff's husband deployed at least three AirTags to covertly track Plaintiff—in her young son's diaper bag, inside the rear-seat upholstery of her car, and in a vehicle she drove on an out-of-state trip— while using his access to her iPhone to turn off the inadequate notifications Apple purportedly relies on to warn victims. Throughout that period he subjected her to escalating physical violence, two forced sexual assaults, threats on her life, and coercive control, culminating in a protection order entered for Plaintiff and her two young children. Plaintiff has suffered severe and continuing emotional distress with physical



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

manifestations, lost income, out-of-pocket safety and legal expenses, and a lasting loss of personal security.

2. On April 20, 2021, during Apple's virtual keynote "Spring Loaded" event, Apple announced and introduced a new accessory called AirTag. The AirTag is a small, battery-operated portable tracking device designed, manufactured, marketed, and distributed for tracking everyday items. At product launch, Apple's Engineering Program Manager, Carolyn Wolfman-Estrada, described AirTag as an accessory "that you can attach…to just about anything." [Timestamp, approx. 8:40]. At all relevant times, Apple commercialized the AirTag as an easy to use and inexpensive device featuring built-in, highly precise location-tracking capabilities.

3. The AirTag is not a standalone GPS device. Its tracking capabilities are driven by an architectural design choice that relies on a vast, automated network of consumer-owned devices. Apple designed the AirTag to continuously broadcast a secure, low-energy Bluetooth signal. When any of the over one billion devices in Apple's proprietary "Find My" network come within range of an AirTag, they automatically detect this beacon signal. The detecting device then transmits to Apple's servers an encrypted report containing the AirTag's rotating public identifier and the detecting device's own location. Apple's servers forward the report to the AirTag owner's "Find My" application, where the owner can view the AirTag's mapped location as updates are received. By leveraging the over one billion consumer Apple devices into a global tracking infrastructure, Apple created a "Find My" network ensuring that a tracker with no internal GPS chip or independent cellular connection can be used to locate an item – or an individual – virtually anywhere in the world, rendering the risk of undetected stalking a built-in feature of the product's design.



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

4. During the same product launch presentation, Apple represented that the AirTag is "designed to track items, not people" and explicitly highlighted built-in features purportedly meant to discourage unwanted tracking. [Timestamp, approx. 9:33]. Thus, by design, Apple recognized that its massive "Find My" network infrastructure could and would be used as a tool for human surveillance. However, while Apple publicly acknowledged this tracking hazard at launch, the safety features it implemented were profoundly inadequate, structurally defective, and entirely incapable of preventing or deterring illicit tracking of individuals.

5. The severe risk of AirTag misuse was entirely foreseen and foreseeable by Apple. Prior to the product's April 2021 launch, prominent privacy advocates, digital security experts, and domestic violence organizations raised concerns that the device's small size, low cost, and ubiquitous location-tracking capabilities could enable abusers and stalkers to monitor individuals without their knowledge or consent. Despite these explicit pre-launch warnings, Apple chose to rush the product to market without implementing safety features to protect non-consenting individuals from covert tracking and surveillance.

6. The catastrophic realization of Apple's defective design rapidly materialized. For example, in response to an April 2, 2024 investigative report aired in the United Kingdom on ITV News, titled *"AirTags becoming 'weapon of choice of stalkers' as GPS tracker cases rocket by 317%,"* Apple publicly admitted the ongoing inadequacy of its safeguards, stating: "We have identified even more ways we can update AirTag safety warnings and help guard against further unwanted tracking."[1] This admission confirms that years after its initial distribution, and despite multiple software patches, the AirTag remains inherently unsafe, unreasonably dangerous, and structurally deficient.

---

[1] *Available at*: https://www.youtube.com/watch?v=TBhYdgt1FhE



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

7. Plaintiff's injuries were not an isolated anomaly, but rather the direct result of a calculated and continuing corporate failure. Apple launched the AirTag despite internal corporate records that reveal its explicit acknowledgment that its safeguards would merely "deter as opposed to prevent malicious use," and despite internal executive admissions that the company rushed the product to market without consulting domestic abuse organizations.[2] Because of this fundamentally unsafe deployment, Apple was flooded with over 40,000 separate stalking reports between 2021 and 2024 – averaging more than 1,000 victims per month.[3] Apple's ongoing public statements continue to concede that this severe risk persists, confirming that years after its initial distribution, the product remains inherently unsafe and its safety protocols are subject to ongoing remediation.

8. Apple knew or reasonably should have known that releasing a low-cost, virtually untraceable surveillance device into a domestic market where millions of women and men are stalked annually, including by an electronic device or application,[4] created extreme risk. Despite explicit warnings that AirTags would be immediately deployed by abusers as a "weapon of choice," Apple failed to exercise reasonable care in designing, testing, and implementing automatic, fail-safe mechanisms to detect and neutralize non-consensual tracking. As a direct and proximate result of Apple's ongoing failure to recall or remediate this defective technology, the AirTag has facilitated the physical and emotional abuse of tens of thousands of stalking

---

[2] *See Freeman v. Apple Inc.*, No. 1:26-cv-10186, ECF No. 1 ¶¶ 19, 55 (N.D. Ill. Aug. 24, 2026) (citing internal Apple corporate emails acknowledging the failure to consult domestic abuse groups and documenting over 40,000 tracking reports received between April 2021 and April 2024).

[3] *Id.*

[4] Rachel E. Morgan & Jennifer L. Truman, U.S. Dep't of Justice, NCJ 301735, *Stalking Victimization, 2019 (2022),* https://bjs.ojp.gov/content/pub/pdf/sv19.pdf (finding 14.4% of the 3.4 million stalking victims' whereabouts were tracked with an electronic device/application).


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

victims across the United States. Indeed, AirTags have been linked directly to stalking-related physical assaults, vehicular violence, and multiple homicides.

9. Prior to releasing the AirTag into the stream of commerce in April 2021, Apple was repeatedly put on actual and constructive notice by privacy technologists and domestic violence advocacy groups that the quarter-size design, inexpensive price point, and massive tracking infrastructure would be readily exploited by stalkers and abusers. For example, immediately following the 2021 product announcement, tech safety specialists at the National Network to End Domestic Violence (NNEDV) sounded the alarm, warning that the trackers would immediately be weaponized by abusive partners to track victims trying to escape.[5] Despite these explicit, pre-launch warnings, Apple consciously disregarded public safety and rushed the product to market with full knowledge that its safety protocols were profoundly inadequate to protect individuals from covert, non-consensual surveillance.

10. At the time of its initial distribution, Defendant's AirTag suffered from severe inherent design defects that rendered it unreasonably dangerous for its foreseeable use and created an unmitigated risk of illicit tracking. Specifically, the original implementation completely lacked critical safety protections and engineering safeguards, prioritizing commercial convenience over human safety:

- **Defective Onboarding and Software Interface Design:** Apple designed the product's digital setup and onboarding flow completely devoid of mandatory user-experience consent gates, friction points, or legal notices. Defendant failed to instruct or warn users at the point of activation that tracking an individual without their explicit consent constitutes a crime, effectively licensing a low-cost tool for unlawful surveillance.

- **Defective Alert Window & Algorithmic Timing:** The product's tracking algorithm was defectively programmed to remain entirely silent for an extended,

---

[5] *Apple AirTags Could Enable Domestic Abuse in Terrifying Ways*, FAST COMPANY (Apr. 20, 2021), https://www.fastcompany.com/90630404/apple-airtags-could-enable-domestic-abuse-in-terrifying-ways



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

arbitrary three-day period after separating from its registered owner. This design feature granted stalkers a massive, uninterrupted window of undetected, real-time surveillance, allowing them to map a victim's habits, home or work address, and daily routines before any safety alert could trigger.

- **Defective Acoustic Engineering and Insufficient Volume:** The physical hardware was designed with an internal speaker incapable of emitting a sufficient decibel level to alert an average victim. When the audible alert finally triggered, the sound volume was restricted to approximately 60 decibels (equivalent only to a quiet conversation) and easily muffled by a car bumper, wheel well, or bag lining. Furthermore, the physical architecture of the AirTag was defectively engineered such that a bad actor could easily dismantle the casing and permanently disable the internal speaker wire without disrupting the device's tracking capabilities.

- **Ambiguous and Inadequate Digital Warnings:** The software design failed to communicate a clear, urgent, and present safety threat. When background alerts did populate on iOS devices, the software displayed a vague, non-specific notification reading "Unknown Accessory Detected." This ambiguous phrasing failed to adequately apprise victims that their precise location was actively being mapped and, furthermore, created severe "alert fatigue" failing to differentiate between a harmless pair of misplaced headphones and an active stalking device.

- **Total Exclusion of Cross-Platform Protections:** Defendant designed its safety ecosystems to work exclusively within its own proprietary software architecture, leaving the vast population of Android users entirely defenseless and exposed to undetected tracking. For the first eight months post-launch, Apple provided zero cross-platform safety measures. Even after the December 2021 release of its "Tracker Detect" application, Apple shifted the entire safety burden onto the public, requiring Android users to take the affirmative, unrealistic step of proactively downloading a separate application and manually initiating scans under the continuous, improbable assumption that they were being surveilled.

11. While Defendant announced certain software and security updates on February 10, 2022, these patches failed to cure the fundamental hardware design defects inherent in the AirTag. Bad actors and third-party commercial entities continue to exploit these physical design flaws to neutralize acoustic safety alerts, a modification that was or should have been entirely foreseeable to Apple due to its failure to design a tamper-proof or modularly isolated acoustic system. For example, third-party accessory manufacturers openly market and sell products like



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

Elevation Lab's "The Silencer – for AirTag," a $9.99 precision-engineered steel pin and baseplate tool specifically designed to permanently puncture and destroy the AirTag's internal speaker within seconds. The commercial proliferation of such tools, and their subsequent removal from the market due to tracking and public safety outcries, highlights the severity of the flaw.[6] Because Apple defectively designed the hardware speaker to be physically vulnerable to external muting without interrupting the device's core tracking capabilities or power supply, the AirTag is easily rendered entirely mute and transformed into an undetectable, weaponized tool for stalking.

12. Apple utterly failed to mitigate the blatant defects in the hardware and software designs of AirTag, defects that it recognized and acknowledged at the product launch. It has been attempting to play catch-up ever since. Its belated attempts to make its product safe are too little too late, as demonstrated by the tens of thousands of complaints of stalking it has received. These complaints are not about inconveniences, connectivity issues, or battery life. Each one of these complaints represents a person who was harmed physically and psychologically. And Apple did this by design.

13. Unwanted tracking and stalking are severe invasions of personal autonomy designed to exert power and control, inflicting profound, long-lasting emotional and psychological trauma upon victims.[7] By failing to implement adequate, fail-safe safety features, Apple created an environment where perpetrators could readily weaponize the AirTag. As a direct result of these inherent product defects, Plaintiff was subjected to severe emotional distress,

---

[6] Marcus Mendes, *ElevationLab pulls AirTag Silencer after backlash over stalking concerns*, 9TO5MAC (Oct. 14, 2026), https://9to5mac.com/2026/10/14/elevationlab-pulls-airtag-silencer-after-backlash-over-stalking-concerns/

[7] U.S. Dep't of Justice, Office for Victims of Crime (OVC), *Stalking*, https://ovc.ojp.gov/topics/stalking (last visited Oct. 14, 2026).


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

perpetual anxiety, and a total loss of personal security. Furthermore, the persistent threat of surveillance forced Plaintiff to incur substantial financial costs including loss of her job, legal fees in excess of $60,000, medical bills, and incidental costs including changing locks to protect her personal safety.

14. Apple's tortious conduct, design omissions, and deceptive business practices directly and proximately caused severe injury to Plaintiff within this judicial district, establishing that the laws of the State of Washington properly govern these claims. Defendant's conduct violates the Washington Product Liability Act (WPLA), RCW 7.72.010, *et seq.*, because the AirTag was defectively designed and lacked adequate warnings regarding its highly foreseeable use as an untraceable stalking tool, and because Defendant failed to provide adequate warnings after manufacture once it learned of that danger. Specifically, the AirTag is defectively designed under the WPLA because: (i) it fails the consumer expectations test, proving unsafe to an extent beyond that which would be contemplated by an ordinary consumer; and (ii) it fails the risk-utility test, as the gravity and likelihood of severe tracking harm heavily outweighed any negligible burden on Defendant to implement automated, cross-platform safeguards prior to launch. Apple's design and warning omissions constitute actionable statutory negligence within the exclusive framework of the WPLA.

15. Separately, Apple's conduct violates the Washington Consumer Protection Act (CPA), RCW 19.86.020 *et seq.*, because its mass commercial marketing of an inherently dangerous tracking device directly affects the public interest and constitutes an unfair and deceptive trade practice. As a direct result of Apple's acts and omissions, Plaintiff suffered distinct injuries to business and property, thereby entitling Plaintiff to actual and compensatory damages under the WPLA, enhanced treble damages and reasonable attorneys' fees as



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

authorized by the CPA, RCW 19.86.090, and punitive damages under California Civil Code § 3294, which governs the punitive-damages issue because the conduct for which punishment is sought occurred in California.

16. Alternatively, and only in the alternative, to the extent the Court conducts a choice-of-law analysis and determines that California law applies to Plaintiff's claims—whether because Apple's tortious design choices, product development, and wholesale failure to implement automated safety features originated entirely within the State of California, or because Apple's iOS Software License Agreement selects California law for matters relating to the iOS software on Plaintiff's iPhone, *see Hughes v. Apple, Inc.*, No. 22-cv-07668-VC, 2024 WL 4828072, at *1 (N.D. Cal. Nov. 18, 2024)—Apple's conduct constitutes actionable negligence and strict products liability under California's risk-benefit test, under which the burden shifts to Apple to prove that the benefits of its design outweigh its risks. *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413 (1978); *Hughes v. Apple, Inc.*, 723 F. Supp. 3d 693, 711 (N.D. Cal. 2024). Apple's conduct further violates the "unlawful" and "unfair" prongs of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"). Plaintiff possesses statutory standing under the UCL because she suffered concrete economic injuries proximately caused by Apple's unfair business practices, for which traditional retroactive monetary remedies at law are inadequate to prevent or mitigate the threat of ongoing and future non-consensual tracking.

17. Plaintiff further seeks injunctive and declaratory relief to remedy Apple's ongoing practice of releasing an unreasonably dangerous product into the stream of commerce, misrepresenting the inherent tracking harms associated therewith, and facilitating the unauthorized, non-consensual location-tracking of individuals.



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

## PARTIES

18. Plaintiff Erica Kommuri is an individual and citizen of the State of Washington, residing in Kitsap County. At all relevant times to this action, Plaintiff was a resident of Washington, was tracked in Washington (and, on one occasion, in Oregon), and suffered the injuries alleged here in Washington. At all relevant times Plaintiff owned and used an Apple iPhone iPhone 14 Pro Max running iOS 26.6.1, subject to Apple's iOS Software License Agreement.

19. Defendant Apple Inc. is a California corporation with its principal executive offices located at One Apple Park Way, Cupertino, California 95014. Apple was originally incorporated under the laws of the State of California in January 1977 under the name Apple Computer, Inc., and officially changed its name to Apple Inc. on January 9, 2007. At all relevant times, Defendant Apple has engaged – and continues to engage – in the business of designing, manufacturing, testing, marketing, distributing, and selling consumer electronic devices and proprietary software tracking networks throughout the United States, including within the Western District of Washington. Apple is the sole corporate entity responsible for designing, managing, and placing the defective AirTag tracking devices and the accompanying "Find My" surveillance network infrastructure into the stream of commerce.

## JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the Plaintiff and the Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21. Plaintiff is a citizen and resident of the State of Washington, residing in Kitsap County. Defendant Apple Inc. is a California corporation with its principal executive offices



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

located at One Apple Park Way, Cupertino, California 95014. Apple is a citizen of the State of California for diversity purposes.

22. This Court has personal jurisdiction over Defendant Apple because Apple conducts substantial, continuous, and systematic business within the State of Washington, including the marketing, retail sale, online distribution, and support of the AirTag devices at issue. Furthermore, specific personal jurisdiction exists because Apple purposefully directed its commercial activities at residents of this State, and a substantial part of the tortious design failures, statutory cyberstalking violations, and resulting injuries giving rise to Plaintiff's claims occurred within Washington.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant Apple regularly conducts business and is subject to personal jurisdiction in this District, thereby residing here for venue purposes under 28 U.S.C. § 1391(c)(2). Furthermore, a substantial part of the events, omissions, and severe injuries giving rise to Plaintiff's claims occurred within Kitsap County, which sits squarely within this judicial district.

## INTRADISTRICT ASSIGNMENT

24. Pursuant to Local Civil Rule 3(e) of the United States District Court for the Western District of Washington, intradistrict assignment to the Tacoma Division is proper because a substantial part of the events, omissions, and severe injuries giving rise to Plaintiff's claims occurred within Kitsap County, Washington, which sits squarely within the geographic territory designated to the Tacoma Division.



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

## CHOICE OF LAW

### A. Washington Law Governs Plaintiff's Claims.

25. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

26. This Court, sitting in diversity, applies the choice-of-law rules of the forum state, Washington, to determine which state's substantive law governs Plaintiff's tort and product liability claims. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

27. Washington courts adhere to the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws § 145 to resolve choice-of-law issues in tort actions. *See Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580, 555 P.2d 997 (1976); *Rice v. Dow Chem. Co.*, 124 Wn.2d 205, 875 P.2d 1213 (1994).

28. Under this framework, courts evaluate the significance of local contacts, including: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, and place of business of the parties; and (d) the place where the relationship between the parties is centered.

29. Application of the most significant relationship test establishes that the substantive law of the State of Washington governs Plaintiff's claims. As set forth above, Plaintiff is a citizen and resident of Washington. The product was directed into and purchased within Washington, the non-consensual tracking and statutory cyberstalking violations occurred within Kitsap County, Washington, and the resulting severe injuries and emotional distress were sustained entirely within this state.

30. Washington has a paramount governmental interest in applying its local laws, specifically including the Washington Product Liability Act (WPLA), RCW 7.72 *et seq.*, to


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

protect its citizens from defective consumer goods distributed within its borders and to ensure its residents are fully compensated for tortious harms suffered locally. The WPLA supplies the exclusive remedy for product-caused harm under Washington law, and Plaintiff's product-liability claims are pleaded under it.

31. Apple's iOS Software License Agreement, to which Plaintiff is a party as an iPhone user, contains a California choice-of-law clause. Under Washington law a contractual choice-of-law clause does not displace the most-significant-relationship analysis for tort claims unless the clause expressly reaches them, and Plaintiff does not invoke that clause as the primary basis for the law governing her claims. Plaintiff pleads California law solely in the alternative under Fed. R. Civ. P. 8(d)(2) and (3), as set forth in the Sixth Claim for Relief, and does not thereby concede that any limitations period other than RCW 7.72.060(3) applies to her claims.

**B. California Law Governs the Punitive-Damages Issue.**

32. Choice of law is determined issue by issue. Whatever law governs liability, the law of California governs whether and in what amount punitive damages may be awarded against Apple, because the conduct for which punishment is sought, Apple's design, marketing and safety decisions concerning the AirTag and the Find My alert system, occurred in California, where Apple is domiciled, and California has the predominant interest in deterring and punishing the conduct of its resident corporations. *Erickson v. Pharmacia LLC*, 5 Wn.3d 585 (2025); *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137 (2009); *Braun v. Crown Crafts Infant Prods., Inc.*, No. C12-5811 RBL, 2014 WL 345246 (W.D. Wash. Jan. 30, 2014); Restatement (Second) of Conflict of Laws § 145 cmt. c, § 171.



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

## FACTUAL ALLEGATIONS

### I. THE EVOLUTION OF CONSUMER LOCATION-TRACKING TECHNOLOGY

#### A. The Traditional GPS and Early Cellular Era (1989 – 2007)

33. Consumer location-tracking technology has existed for decades, but was historically constrained by hardware size, high costs, heavy power requirements, and the lack of a ubiquitous data-relay network. For example, the first commercially available handheld GPS (Global Positioning System) receiver, the Magellan NAV 1000, entered the market in May 1989 for recreational marine and wilderness navigation.[8] It measured 8.75 inches by 3.5 inches by 2.25 inches, weighed 1.5 pounds, and required approximately four minutes to calculate a single geographic position.[9]

34. In 1996, the Federal Communications Commission ("FCC") issued its landmark enhanced 911 ("E911") mandate, requiring wireless carriers to transmit an emergency caller's location data to public safety answering points.[10] Subsequent phases of the E911 rule forced carriers to pinpoint a caller's latitude and longitude within a strict 50-to-300 meter accuracy radius.[11] This regulatory shift codified location-tracking capabilities not as a commercial tracking tool, but as a heavily restricted safety feature built exclusively into commercial cellular networks.

---

[8] *Magellan NAV 1000 GPS Receiver (1988)*, TIME & NAVIGATION, https://timeandnavigation.si.edu/multimedia-asset/magellan-nav-1000-gps-receiver-1988

[9] *Magellan "NAV 1000" Hand-Held GPS Receiver*, SMITHSONIAN INSTITUTION COLLECTIONS SEARCH CENTER, https://collections.si.edu/search/detail/edanmdm:nmah_1405613

[10] *See Revision of the Comm'n's Rules To Ensure Compatibility with Enhanced 911 Emergency Calling Sys.*, Report and Order, 11 FCC Rcd. 18,676 (1996) (establishing the initial regulatory framework for automated wireless location tracking).

[11] 47 C.F.R. § 20.18 (2025) (establishing location-accuracy requirements for enhanced 911 wireless services).


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

**B. The Integration of Smartphones and Opt-in Bluetooth Tracking (2008 – 2018)**

35. The advent of smartphones subsequently integrated sophisticated location-tracking technology directly into consumer software. In January 2008, Apple released an iOS software update that introduced a "Locate Me" feature to its native Maps application, initially relying on third-party Wi-Fi positioning data from Skyhook Wireless, Inc., and cell-tower mapping from Google software that added a "locate me" function to its Maps application on the iPhone and iPod touch.[12] While the original iPhone lacked a physical GPS chip, Apple integrated hardware-based Assisted GPS with the launch of the iPhone 3G in July 2008.[13] Apple eventually displaced third-party providers by building its own proprietary database of Wi-Fi access points and cell towers, compiled from data collected by its users' active devices.[14] This crowdsourced architecture laid the operational blueprint for Apple's modern "Find My" network, which turns nearby consumer devices into passive tracking nodes to detect and report geographical locations.[15]

36. In 2013, Tile, Inc. ("Tile") launched the modern Bluetooth tracker market via a crowdfunding campaign, beginning commercial shipments in 2014.[16] Utilizing Bluetooth Low

---

[12] *iPhone and iPod touch Become Self-Aware*, TIDBITS (Jan. 15, 2008), https://tidbits.com/2008/01/15/iphone-and-ipod-touch-become-self-aware/; *see also* Andrew Garcia, *Skyhook's iPhone Possibilities*, eWEEK (Jan. 15, 2008), https://www.eweek.com/de/reviews/skyhook-s-iphone-possibilities/.

[13] *iPhone 3G - Full Phone Information, Tech Specs*, IGOTOFFER, https://igotoffer.com/apple/iphone-3g-smartphone; *see also What is GPS? How does the iPhone GPS work?*, EVERYMAC.COM, https://everymac.com/systems/apple/iphone/iphone-faq/iphone-gps-definition-assisted-gps-how-gps-works-real-time-navigation.html

[14] *After Google incident, Wi-Fi data collection goes on*, MACWORLD (Sept. 8, 2010), https://www.macworld.com/article/207599/wifi_data_collection.html; *see also* Ki Mae Heussner, *Apple Responds to iPhone Tracking Controversy*, ABC NEWS (Apr. 27, 2011), https://abcnews.com/Technology/apple-responds-iphone-tracking-controversy/story?id=13468295

[15] *Apple introduces AirTag*, Apple Newsroom (Apr. 20, 2021), https://www.apple.com/newsroom/2021/04/apple-introduces-airtag/

[16] Natasha Lomas, *Tile Grabs $2.6M Via Selfstarter For Its Lost Property-Finding Bluetooth Tags Plus App*, TECHCRUNCH (July 24, 2013), https://techcrunch.com/2013/07/24/tile-grabs-2-6m-via-selfstarter-for-its-lost-property-finding-bluetooth-tags-plus-app/


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

Energy (“BLE”) beaconing, Tile’s quarter-sized hardware tokens allowed consumers to locate nearby items like missing keys, wallets, and luggage.[17] Under this framework, a lost Tile token emitted a localized Bluetooth broadcast. If any third-party smartphone running the active Tile application passed within physical range of the beacon, that device automatically captured the signal, cross-referenced it with its own global positioning coordinates, and securely relayed the tracker’s geographical location back to the true owner.[18] To track items left outside a user’s immediate physical vicinity, Tile relied on a proprietary network architecture it termed “crowd GPS.”[19] This framework systematically leveraged the collective background application footprint of other users to locate missing tags. Other competitors, such as TrackR and Chipolo, subsequently entered the consumer marketplace using virtually identical low-energy Bluetooth beaconing models to establish independent, crowd-sourced tracking networks.[20]

37. Crucially, the consumer tracking market established by Tile and its early competitors was fundamentally restricted by localized, fragmented, and strictly *opt-in* network architectures, which required third-party users to affirmatively download and maintain a brand-specific application to locate missing items.[21] Because legacy trackers lacked independent GPS chips or cellular modems, they were completely dependent on a sparse network of third-party

---

[17] Michelle Goodman, *Hate Losing Your Stuff? You’ll Love Tile.*, ENTREPRENEUR (Feb. 12, 2015), https://www.entrepreneur.com/article/241519

[18] *Id.*

[19] *See* Complaint at 11, *Ireland-Gordy v. Tile Inc.*, No. 3:24-cv-XXXX (N.D. Cal. filed 2024) (describing the standard industry operation of “crowd GPS” features in early consumer item-tracking litigation).

[20] *See Bluetooth Trackers And The Race To Help You Find Your Stuff*, FAST COMPANY (Mar. 28, 2017), https://www.fastcompany.com/3069233/bluetooth-trackers-and-the-race-to-help-you-find-your-stuff (detailing how TrackR, Chipolo, and Tile competed by deploying variations of crowdsourced BLE positioning networks); *see also Look out for the Chipolo Bluetooth item trackers at CES 2017*, CNET (Jan. 8, 2017), https://www.cnet.com/reviews/chipolo-item-tracker-preview/ (describing the industry-wide reliance on "crowd GPS" features to locate out-of-range tags).

[21] *See Tile vs. TrackR vs. Chipolo: The Best Bluetooth Tracker*, TOM'S GUIDE (Sept. 14, 2018), tomsguide.com (detailing how the efficacy of early Bluetooth trackers depended entirely on the fragmented size of each company's separate, user-installed application ecosystem).


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

users who had intentionally downloaded and configured that specific company's software to relay location data.[22]

### C. Apple's Creation of the "Find My" Ubiquitous Surveillance Infrastructure

38. Defendant Apple fundamentally shifted the location-technology landscape by leveraging its closed software ecosystem to construct a global surveillance network of unprecedented scale. Rather than building a traditional, opt-in framework or requiring users to actively download a standalone application, Apple unilaterally transformed its existing network of nearly one billion active consumer devices – including iPhones, iPads, and Mac computers – into a passive, automated tracking system known as the "Find My" network. By utilizing a force-enrollment architecture that turns consumers' personal devices into crowdsourced tracking nodes, Apple eliminated the physical and structural limitations that historically prevented Bluetooth trackers from being utilized as effective tools for real-time, long-range unwanted tracking.




Fig. 1 – Apple's "Find My" app

[22] *See How Bluetooth Trackers Work*, CONSUMER REPORTS (May 12, 2016), consumerreports.org (explaining that early electronic tags had no onboard GPS or cellular capabilities and relied entirely on localized networks of active app users to bridge the connection to the internet).


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

39. This architectural shift completely eradicated the market's primary baseline safety feature: user volition. While legacy trackers like Tile were fundamentally limited by sparse networks consisting strictly of consumers who affirmatively chose to download an application, Apple bypassed consumer consent entirely. By engineering every active iOS device to constantly scan for background Bluetooth Low Energy signals and silently relay precise geographic coordinates back to Apple's centralized servers, Apple established an inescapable tracking matrix where an individual is virtually never more than 100 yards away from a surveillance node. By coupling this network with an inexpensive, easily concealed $29 plastic token, Apple manufactured a uniquely dangerous product defect that transformed a niche convenience tool into a weaponized ecosystem for non-consensual location surveillance.

## II. APPLE'S "PRECISION FINDING" TECHNOLOGY IS A HYPER-TARGETED GUIDANCE SYSTEM

40. Beyond constructing a ubiquitous network to transmit macro-level long-range geographic positions, Defendant Apple built advanced, high-fidelity spatial guidance features directly into the AirTag hardware, vastly elevating its utility as a weapon for unwanted tracking. Specifically, Apple integrated a proprietary Ultra-Wideband ("UWB") wireless radio chip, such as the Apple U1 or subsequent U2 microprocessors, to power a native tracking interface termed "Precision Finding." Originally developed for highly restricted military radar and covert defense communications, UWB technology does not merely measure abstract Bluetooth signal strength; instead, it transmits nanosecond radio pulses to calculate the exact travel time of light-speed signals, pinpointing spatial coordinates with centimeter-level precision. When an illicit tracker transitions from long-range surveillance to short-range physical confrontation, the Precision Finding software provides a real-time directional radar on the tracker's smartphone interface. This interface displays an on-screen arrow guiding the tracker directly to the hidden AirTag's



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

precise location down to the inch, augmented by accelerating haptic vibrations and sound feedback. By engineering this high-precision radar into a $29 mass-market device, Apple systematically armed bad actors with the technological capability to physically locate non-consensual victims in real time, even if a victim attempts to seek refuge inside a hidden location, domestic violence shelter, or crowded public venue.




Fig. 2 – Apple's "Precision Finding"

## III. AIRTAG'S INNOCUOUS TOKEN DESIGN

41. Crucially, Defendant Apple chose to house this advanced tracking infrastructure and high-fidelity spatial radar inside a hyper-compact, visually unassuming hardware casing designed to resemble a benign consumer accessory. Measuring a mere 1.26 inches in diameter, a thickness of only 0.31 inches, and weighing a scant 0.39 ounces, the AirTag was styled as a sleek, polished white plastic and stainless-steel disc. Apple deliberately engineered and marketed this minimalist form factor as a fashionable lifestyle token meant to blend seamlessly into everyday consumer environments, directly resulting in a device that is inherently optimized for covert concealment.



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491




Fig. 3 – Apple AirTag

42. This innocuous, diminutive design functions as a severe physical defect in the context of unauthorized surveillance by stripping away the natural visual barriers to stalking. Unlike legacy tracking hardware—which was historically bulky, easily detected, and required visible wiring or substantial external battery packs—the AirTag's ultra-compact, minimalist design allows it to be effortlessly slipped into a victim's purse pocket, tucked behind a vehicle's license plate, or sewn directly into clothing linings without drawing suspicion. By deliberately packing an inescapable global network infrastructure and high-precision spatial radar into an innocuous, easily masked object, Apple engineered a product that is uniquely optimized for total concealment, thereby drastically increasing the risk of undetected stalking and foreseeable physical harm to non-consensual victims.



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491




Fig. 4




Fig. 5

## IV. AIRTAG'S APRIL 20, 2021, COMMERCIAL LAUNCH DAY ADMISSIONS

### A. Knowledge of Foreseeable Harm and Pre-Launch Warnings

43. On April 20, 2021, during its virtual keynote "Spring Loaded" broadcast event, Defendant Apple officially introduced the AirTag to the global consumer market. Apple engineered, manufactured, and commercialized this small, battery-operated portable tracking device that could be attached "to just about anything". During the product launch presentation, Apple's Engineering Program Manager, Carolyn Wolfman-Estrada, openly acknowledged the



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

human surveillance hazards inherent in deploying an unconstrained global tracking network, representing that the AirTag was "designed to track items, not people," and highlighting built-in features purportedly meant to discourage unwanted tracking. [Timestamp, approx. 9:37]




Fig. 6

44. By design, Apple fully recognized at launch that its massive "Find My" infrastructure would immediately be exploited as a low-cost tool for non-consensual human tracking. Yet, despite this actual knowledge, Apple carelessly pushed the product into trade and commerce with safety features that were profoundly inadequate, structurally defective, and entirely incapable of preventing or deterring real-world cyberstalking.

**B. Apple's Coordinated Campaign to Call the AirTag "Stalker-Proof"**

45. Rather than heed the warnings of domestic-violence advocates and technologists, Apple set out to dismiss them. In the days after the AirTag's April 20, 2021 announcement, Apple made two senior executives—Kaiann Drance, its Vice President of Worldwide iPhone Product Marketing, and Ron Huang, its Senior Director of Sensing and Connectivity—available to the press to promote the AirTag's anti-stalking features. The coverage that followed, published across multiple outlets on April 22, 2021, presented the AirTag to the public as "stalker-proof,"



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

including under the headlines "Apple execs explain how AirTag is 'stalker-proof,'"[23] "How Apple designed AirTags to be privacy-first and stalker-proof,"[24] "AirTag is stalker-proof even with Android users,"[25] and "Apple Says AirTags Are Stalker-Proof."[26]

46. These interviews were part of an intentional, coordinated press campaign in which Apple's executives and publicists sought to portray the AirTag as a harmless—indeed "stalker-proof"—product, at the very moment advocates were warning that it would be turned against intimate partners. Apple thus did not merely fail to disclose the AirTag's risks to the people most likely to be tracked with it; it affirmatively told the public that those risks had been designed away. On information and belief, Apple never retracted or corrected that characterization. Apple's campaign is evidence of its knowledge of the stalking risk, of its conscious disregard of that risk, and of the deceptive and unfair practices alleged in the Third Claim for Relief.

## V. THE IMMEDIATE PRESS OUTCRY, PRESS EXPOSÉS, AND SYSTEMIC FALLOUT

### A. The Immediate Launch-Window Warnings and Technical Proof of Concept (April – May 2021)

47. Immediately upon the AirTag's retail release, cybersecurity experts, privacy advocates, and mainstream investigative journalists systematically exposed critical safety flaws in the device, debunking claims that its anti-stalking protections were effective. Within days of

---

[23] José Adorno, *Apple Execs Explain How AirTag Is 'Stalker-Proof' and Whether You Should Use It to Track Pets*, 9TO5MAC (Apr. 22, 2021), https://9to5mac.com/2021/04/22/apple-execs-explain-how-airtag-is-stalker-proof-and-whether-you-should-use-it-to-track-pets/.

[24] Michael Grothaus, *How Apple Designed AirTags to Be Privacy-First and Stalker-Proof*, FAST COMPANY (Apr. 22, 2021), https://www.fastcompany.com/90628073/apple-airtag-privacy-security (interviewing Kaiann Drance and Ron Huang).

[25] *AirTag Is Stalker-Proof Even with Android Users*, TECHTELEGRAPH (Apr. 22, 2021), https://techtelegraph.co.uk/airtag-is-stalker-proof-even-with-android-users/.

[26] Dave LeClair, *Apple Says AirTags Are Stalker-Proof, Not for Tracking Kids and Pets*, MAKEUSEOF (Apr. 22, 2021), https://www.makeuseof.com/airtags-stalker-proof-not-kids-pets/.


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

launch, controlled field-testing verified that Apple had commercialized an inexpensive, highly optimized tracking device while completely failing to implement adequate safeguards to protect non-consensual location-tracking targets.

48. Before the product had been on store shelves for a full day, *Fast Company* published an exposé on April 29, 2021, titled "*Apple AirTags could enable domestic abuse in terrifying ways,*" warning that Apple's safety model was fundamentally flawed by relying on a "stranger danger" framework.[27] The report noted that this framework ignored intimate-partner violence realities where abusers have shared immediate access to a victim's home, vehicles, and personal effects.

49. On April 30, 2021 – the exact date the AirTag was released for retail sale – *9to5Mac* published an analysis titled, *"Apple reveals more about AirTag stalking protections as domestic abuse concerns expressed."*[28] The report detailed urgent anxieties raised by domestic violence advocacy groups, warning that an abuser could effortlessly plant an AirTag into a partner's bag or jacket lining. The publication specifically flagged a critical architectural flaw: Apple had excluded the Android mobile user base from its native smartphone alert network, leaving more than half of the domestic mobile market entirely blind to surreptitious surveillance.

50. On May 5, 2021, *The Washington Post* published a detailed investigation by prominent technology columnist Geoffrey A. Fowler titled, *"Apple's AirTag trackers made it frighteningly easy to 'Stalk' me in a test,"* exposing the severe safety hazards inherent to the device.[29] The investigation documented a controlled experiment where a colleague tracked

---

[27] Mark Wilson, *Apple AirTags Could Enable Domestic Abuse in Terrifying Ways*, FAST COMPANY (Apr. 29, 2021), https://www.fastcompany.com/90630404/apple-airtags-could-enable-domestic-abuse-in-terrifying-ways
[28] Ben Lovejoy, *Apple Reveals More About AirTag Stalking Protections as Domestic Abuse Concerns Expressed*, 9TO5MAC (Apr. 30, 2021), https://9to5mac.com/2021/04/30/airtag-stalking-protections/
[29] Geoffrey A. Fowler, *Apple's AirTag Trackers Made It Frighteningly Easy to 'Stalk' Me in a Test*, WASH. POST (May 5, 2021), https://www.washingtonpost.com/technology/2021/05/05/apple-airtags-stalking/


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

Fowler's precise movements across a major metropolitan area for days. Concluding that the device represented a dangerous vehicle for "inexpensive, effective stalking," the investigation underscored that Apple's audio chimes and smartphone notices completely failed to mitigate the risk of real-time tracking.

51. Concurrently, as part of the same investigation, *The Washington Post* released a companion video report titled, "*Apple's AirTags could be used by stalkers. Here's how to protect yourself*."[30] In the broadcast, Fowler conducted hands-on testing of the product's built-in anti-stalking measures and concluded that Apple's safeguards were fundamentally insufficient. The report identified specific engineering and design flaws, including delayed digital alerts and audible chimes that were too quiet to notice if concealed in a vehicle or bag, which effectively shifted the burden of safety and detection entirely onto the victim. To mitigate the public danger created by the product's release, the video provided a tutorial to teach citizens how to manually locate rogue AirTags shadowing them.

52. On May 6, 2021, *9to5Mac* published a follow-up exposé titled *"AirTag Stalking 'Frighteningly Easy'; Multiple Problems Identified."*[31] The publication synthesized a litany of structural design defects inherent in the product's interface that an abusive or controlling partner could easily exploit to monitor a victim without triggering immediate detection.

53. National broadcast media corroborated these findings. In May 2021, *CBS News* aired an investigative segment titled, "*Apple AirTags 'Terrifyingly Good' at Tracking Stuff —*

---

[30] Geoffrey A. Fowler, *Apple's AirTags Could Be Used by Stalkers. Here's How to Protect Yourself*, WASH. POST (May 5, 2021), https://www.washingtonpost.com/video/technology/upgrade-with-geoffrey-fowler/apples-airtags-could-be-used-by-stalkers-heres-how-to-protect-yourself/2021/05/05/132beebf-0047-424a-8089-58304bb6e63f_video.html

[31] Ben Lovejoy, *AirTag Stalking 'Frighteningly Easy'; Multiple Problems Identified*, 9TO5MAC (May 6, 2021), https://9to5mac.com/2021/05/06/airtag-stalking/


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

*and Potentially Helping Stalkers.*"[32] During the broadcast, security experts demonstrated how seamlessly the device could facilitate unwanted tracking and weaponize domestic abuse by mapping a target's real-time geographical movements without adequate, immediate warnings.

54. On May 13, 2021, *The Washington Post* published an expansive opinion piece evaluating the broader societal threat of the AirTag ecosystem.[33] The analysis concluded that the device effectively operated as mass-market "stalkerware."[34] It sharply rebuked Apple's corporate methodology, noting that developers frequently ignore or underestimate the possibility for severe harm and stating that responsible technology corporations have an absolute duty to comprehensively evaluate potential human injuries *before* launching a surveillance-capable product into trade and commerce.[35]

**B. The Escalating Wave of Stalking Reports, Criminal Misuse, and Law Enforcement Alarms (December 2021 – February 2022)**

55. As the product remained on the market without necessary structural software and engineering remediation, the pre- and post-launch warnings predictably materialized into a widespread public safety crisis. By late 2021 and early 2022, local law enforcement blotters and major news outlets were inundated with reports of victims discovering rogue AirTags hidden within their vehicles, personal effects, and physical property.

56. On December 30, 2021, *The New York Times* published an investigative report detailing the real-world experiences of seven different women who discovered they had been

---

[32] Megan Cerullo, *Apple AirTags "Terrifyingly Good" at Tracking Stuff – and Potentially Helping Stalkers*, CBS NEWS (May 12, 2021), https://www.cbsnews.com/news/apple-airtag-stalking-risk-tech-experts-warn/
[33] Opinion, *Apple's AirTag Offers Convenience but Poses Serious Threats – and It's Not Alone*, WASH. POST (MAY 13, 2021), https://www.washingtonpost.com/opinions/2021/05/13/apple-airtag-tracking-threats-abuse/
[34] *Id.*
[35] *Id.*


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

surreptitiously tracked with the devices.[36] The article documented how domestic violence groups and digital privacy experts had explicitly warned Apple about these exact tracking dangers before the device was launched into the consumer marketplace.[37]

57. On December 23, 2021, *NBC News* published a sweeping report titled, "*A tracking device made by Apple is showing up in suspected crimes*."[38] Gathering data from municipal law enforcement agencies, the investigation revealed that police departments across multiple states, including Colorado, Georgia, Michigan, and Texas, were experiencing an unprecedented surge in AirTag misuse, heavily concentrated in domestic stalking, predatory harassment, and sophisticated auto theft campaigns.[39]

58. In January 2022, *The Guardian* published an in-depth feature titled *"'I was just really scared': Apple AirTags lead to stalking complaints."*[40] The article centered on a viral case of a woman discovering an unknown AirTag tracking her movements and incorporated analysis from the Electronic Frontier Foundation ("EFF").[41] Cybersecurity experts from the EFF detailed that while dedicated digital spyware existed historically, Apple's creation of a global, turnkey crowdsourced network made the AirTag uniquely dangerous because it commercialized tracking to ordinary, non-technical abusers at a trivial $29 price point.[42]

---

[36] Ryan Mac and Kashmir Hill, *Are Apple AirTags Being Used to Track People and Steal Cars?*, N.Y. TIMES (Dec. 30, 2021), https://www.nytimes.com/2021/12/30/technology/apple-airtags-tracking-stalking.html

[37] *Id.* (detailing that privacy researchers and safety advocates immediately recognized that the absolute scale and precision of the Find My infrastructure would turn the AirTag into an unprecedented tool for non-consensual surveillance).

[38] *A Tracking Device Made by Apple Is Showing Up in Suspected Crimes*, NBC NEWS (Dec. 23, 2021), https://www.nbcnews.com/news/apple-airtag-showing-up-crimes-rcna9416

[39] *Id.* (documenting statements from police officials and computer security experts confirming that Apple's homing beacons were actively linked to escalating instances of vehicle theft and non-consensual surveillance).

[40] Adrienne Matei, *'I Was Just Really Scared': Apple AirTags Lead to Stalking Complaints*, The Guardian (Jan. 20, 2022), https://www.theguardian.com/technology/2022/jan/20/apple-airtags-stalking-complaints-technology

[41] *Id.*

[42] *Id.*



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

59. On February 10, 2022, *NBC News* reported on Apple's reactionary software modification efforts in an article titled *"Apple to add warning to AirTag tracking devices, suspected in crimes."*[43] The report highlighted that following intense pressure from law enforcement agencies dealing with a flood of vehicle thefts and domestic stalking, Apple was forced to issue software updates introducing artificial setup warnings—a tacit admission by Apple that the original product left its control in an un-warned, unreasonably dangerous condition.[44]

60. The crisis escalated to state-level law enforcement leadership. On February 17, 2022, *Tom's Guide* reported in an article titled, *"AirTags Stalking — State AGs for New York, Pennsylvania Just Issued Warnings,"* that the Attorneys General of New York and Pennsylvania had taken the extraordinary step of issuing formal consumer alerts.[45] These executive law enforcement actions explicitly warned citizens that the AirTag was being actively used as a covert tool to violate privacy rights, execute domestic harassment, and stalk residents within their respective states.[46]

### C. The One-Year Mark (April 2022): Public Records Prove a Pervasive National Pattern

61. By the one-year commercial anniversary of the product's launch, public record requests exposed that AirTag stalking was not a series of isolated anomalies, but a systemic national epidemic. On April 6, 2022, *Vice/Motherboard* published a comprehensive public records investigation titled, *"Police Records Show Women Are Being Stalked With Apple*

---

[43] David Ingram, *Apple to Add Warning to AirTag Tracking Devices, Suspected in Crimes*, NBC NEWS (Feb. 10, 2022), https://www.nbcnews.com/tech/tech-news/apple-airtags-new-warnings-rcna15769
[44] *Id.*
[45] Paul Wagenseil, *AirTags Stalking — State AGs for New York, Pennsylvania Just Issued Warnings*, TOM'S GUIDE (Feb. 17, 2022), https://www.tomsguide.com/news/airtag-stalking-attorneys-general-warning
[46] *Id.*


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

*AirTags Across the Country."*[47] By compiling internal law enforcement logs from major municipal areas, *Vice* proved that AirTags were being heavily utilized as tools to track, terrorize, and harass women on a massive scale—exactly as privacy advocates had forecasted during the pre-launch phase.[48]

62. On April 7, 2022, *Fortune* published an analytical piece summarizing the legal and ethical fallout of the product's first year in commerce, titled, "*Apple's AirTags stalking problem comes into better focus*."[49] The analysis argued that through its corporate negligence, Apple had placed itself directly "in the stalking business."[50] It concluded that the technology giant could ultimately face a legal reckoning over whether the minor consumer convenience of tracking misplaced items could ever legally outweigh the profound, life-altering harms inflicted upon non-consensual human targets.[51]

## VI. THE INHERENT INFIRMITIES AND DEFECTS OF APPLE'S POST-HOC SOFTWARE SAFEGUARDS

63. **Post-Hoc Software Remediation as an Admission of Inadequate Design.** As the public safety crisis escalated throughout 2021 and 2022, Defendant Apple was forced to abandon its defensive public relations position regarding the safety of the device. Instead of initiating a product recall, suspending access to the Find My network, or executing meaningful pre-market testing to engineer actual safeguards, Apple deliberately chose a slow, piecemeal remediation strategy. Apple elected to release a series of minor, retroactive software updates – including superficial pairing warnings and delayed tracking alerts, that failed to alter the device's

---

[47] Samantha Cole, *Police Records Show Women Are Being Stalked With Apple AirTags Across the Country*, VICE (Apr. 6, 2022), https://www.vice.com/en/article/apple-airtags-police-reports-stalking-harassment/

[48] *Id.*

[49] Jacob Carpenter, *Apple's AirTags Stalking Problem Comes Into Better Focus*, FORTUNE (Apr. 7, 2022), https://fortune.com/2022/04/07/apple-airtags-stalking-harassment-tracking/

[50] *Id.*

[51] *Id.*



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

dangerous physical characteristics. These software patches constitute a tacit admission by Apple that the AirTag left its operational control in an unreasonably dangerous condition. By relying entirely on these superficial algorithmic tweaks, Apple systematically shifted the operational burden of safety, hardware detection, and surveillance mitigation entirely onto non-consensual tracking targets.

64. To date, Apple's post-hoc safety measures remain fundamentally defective and structurally incapable of providing immediate, autonomous protection to the public. As consumer cybersecurity experts have noted, Apple's engineering methodology forces it to engage in reactive, post-market damage control rather than implementing proactive safety architecture. By quietly deploying incomplete software patches to mitigate structural flaws in a product that was dangerously rushed to market without rigorous pre-release threat modeling, Apple has failed to cure the ongoing public safety hazard. These superficial software revisions leave non-consensual tracking targets exposed to a continuous risk of surreptitious surveillance, psychological distress, and physical vulnerability.

65. **Failure to Warn/ Inadequate Warning**. Defendant Apple Inc. designed a safety alert infrastructure that is hyper-dependent on a complex, unbroken chain of active digital settings, creating a fragile defensive ecosystem that is easily and routinely disrupted by standard consumer operation. Unwanted tracking notifications for AirTags are available on iPhone or iPad with iOS 14.5, iPadOS 14.5, or later. According to Apple's Personal Safety User Guide, for a consumer to "[t]urn on unwanted tracking notifications" [52]:

---

[52] *Detect unwanted trackers*, Apple Personal Safety User Guide, APPLE INC., https://support.apple.com/guide/personal-safety/detect-unwanted-trackers-ips139b15fd9/web


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

### Turn on unwanted tracking notifications

To receive unwanted tracking notifications on an iPhone or iPad with iOS 14.5, iPadOS 14.5, or later, make sure that you:

- Go to Settings > Privacy & Security > Location Services, and turn Location Services on.
- Go to Settings > Privacy & Security > Location Services > System Services, and turn Find My iPhone on.
- Go to Settings > Bluetooth, and turn on Bluetooth.
- Go to Settings > Notifications > scroll down to Tracking Notifications, then turn on Allow Notifications.
- Turn off airplane mode. If your device is in airplane mode, you don't receive tracking notifications.

Fig. 6

66. However, Defendant Apple failed to provide any conspicuous, system-level warnings or disclosures to iOS consumers alerting them that altering a single one of these mandatory system settings, such as toggling off Bluetooth to preserve battery life or turning on Airplane Mode, instantly and completely deactivates the device's ability to detect and alert the user to nearby malicious tracking devices.

67. Even when a foreseeable victim has maintained the required device settings, Defendant's tracking notification system is defective because it fails to provide a timely warning. By design, Defendant's proprietary software utilizes an algorithm that deliberately delays triggering an alert until the system aggregates historical location data over a prolonged period to confirm the tracker is traveling with the victim. Because this warning is structurally engineered to trigger only after an extended duration of exposure, it fails its essential safety purpose. A warning delayed by hours or days is functionally no warning at all. Real-world applications of this defect have resulted in victims traveling for twelve hours or more before receiving any system notification that they were being tracked. In many instances, victims receive no notification at all, only discovering the device after hearing a physical chime or discovering the hidden hardware by chance.


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

68. An individual utilizing an iOS device is entirely unable to independently trigger a manual scan for nearby malicious tracking devices. Instead, a stalked individual remains at the mercy of Defendant's passive operating system to determine whether an AirTag is moving with them. Furthermore, Defendant's notification system is inherently defective because the safety alerts are unstable and temporary. To prevent third-party profiling, the AirTag is engineered with a systemic identifier rotation protocol that continuously alters its Bluetooth public key. However, Defendant's notification software fails to recognize these rotated keys as the same physical tracker, causing the victim's iPhone to abruptly erase active "Unwanted Tracking Notifications" and historical route telemetry overnight. This defect is severely compounded by a software flaw known as a proximity reset. If a malicious actor briefly passes close to the victim, as is all too likely with intimate partner abuse, the hidden tracker re-establishes a localized connection with the owner's primary device, causing the victim's iPhone to falsely conclude that the threat has dissipated. The notification immediately vanishes, and the critical "Play Sound" capability is deactivated. By repeatedly wiping active warnings and resetting the safety threshold before a victim can locate the hardware, Defendant's system configuration actively conceals an ongoing threat. This failure to maintain a continuous, stable warning renders the product's safety features inadequate to protect victims from ongoing unwanted tracking.

69. Furthermore, even when Defendant's safety alert system functions as intended and generates a notification, the software architecture shifts an unreasonable, dangerous, and legally inadequate burden of physical mitigation onto the victim. According to Defendant's official safety instructions:


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

If you get an unwanted tracking notification

Follow these steps to find the item:

1. Tap the notification.
2. Tap continue and then tap Play Sound, or, if available, tap Find Nearby to use Precision Finding to help you locate the unknown item.




If the option to play a sound isn't available or if you're unable to locate the item with Precision Finding, the item may not be near you anymore. If you believe the item is still with you, look through your belongings to try to locate it. Check on your person, or in anything in your possession that could contain the device. It could be in an item that you don't check often, like a jacket pocket, the outer compartment of a bag, or your vehicle. If you can't find the device and if you feel your safety is at risk, go to a safe public location and contact law enforcement.

Fig. 7

70. The warning text displayed in Defendant's "AirTag Detected Near You" notification is inadequate because it fails to communicate the severity of the hazard or provide explicit, immediate instructions for safe mitigation. Rather than instructing a potential stalking victim to take proactive safety measures, the alert provides a passive, ambiguous message that fails to convey urgency. By failing to integrate clear, sequential safety directives directly into the primary notification interface, Apple's warning fails its essential purpose of guiding a foreseeable victim out of active physical danger, rendering the product's safety documentation and interface legally deficient.

71. **Inherent Latency and the Defective Delayed-Alert Framework.** Defendant Apple's post-hoc safety measures remain fundamentally defective and structurally incapable of providing immediate, autonomous protection to the public due to an engineered notification



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

latency. For users within the iOS operating system, Apple's automated background detection logic relies on a severely delayed algorithm. Originally, Apple's software design would wait up to 72 hours before alerting an individual that an unknown, illicit AirTag was traveling with them. While Apple subsequently shortened this tracking window to an estimated four to eight hours following intense public backlash, this diagnostic lag remains a highly dangerous and defective delay. Rather than alerting a non-consensual tracking target immediately upon detecting an unrecognized background Bluetooth Low Energy broadcast, Apple's hardcoded latency hands stalkers a multi-hour window of unhindered, real-time surveillance. This design flaw gives bad actors ample time to discover a victim's home address, identify a domestic violence shelter, or map out exact daily physical routines before an on-screen safety notice ever appears, effectively turning a purported safeguard into a tracking efficiency mechanism.

72. **Structural Vulnerabilities Exposed by Algorithmic Blindness and the Denial of Proactive Scanning.** The fundamental inadequacy of Defendant Apple's software patches is primarily driven by an engineered failure to provide standard safety features to non-consensual tracking targets. First, Apple's safety metrics incorporate a fatal algorithmic defect by systematically muting or delaying alerts when a rogue AirTag is detected near a user's designated "Significant Locations" (such as a primary home address or workplace) to prevent what Apple deemed superficial "false positives." This operational choice creates a security blind spot, completely ignoring the realities of intimate-partner violence where an abuser already shares access to the target's domestic sanctuary. Second, Apple's native iOS architecture completely denies users the ability to perform manual, proactive scanning. An iPhone user cannot open an application to actively verify their surroundings, forcing them to remain entirely at the mercy of Apple's automated, inconsistent, and delayed background algorithm. By filtering out tracking



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

alerts at a target's most vulnerable physical intersections and denying proactive validation tools, Apple's reactive remediation functions not as a protective shield, but as an active concealment mechanism for stalkers.

73. **Alerts Are Delivered Only Through Settings Any Abuser Can Switch Off, Without Authentication or Notice.** Apple designed its sole safeguard—the unwanted-tracking notification—to depend on ordinary device settings that any person holding the victim's unlocked iPhone can change in seconds: Location Services, Bluetooth, the "Tracking Notifications" toggle within Notifications settings, and Airplane Mode. iOS also permits any user of the phone to "pause" safety alerts for a particular item for a day or indefinitely. iOS requires no biometric confirmation, imposes no security delay, and sends no notice to the account holder when safety alerts are disabled. Apple's own support materials acknowledge that disabling Location Services prevents unwanted-tracking alerts, yet iOS does not warn the user of that consequence. This design ignores the threat model that domestic-violence advocates described to Apple before launch: the intimate partner who knows the victim's passcode and shares her home. Apple knows how to protect a setting from a person who holds the passcode. Since iOS 17.3 (January 2024), Apple's "Stolen Device Protection" has required Face ID or Touch ID, with no passcode fallback, and a one-hour security delay before certain sensitive changes, but, by default, only when the phone is away from "familiar locations" such as the user's home, and the Tracking Notifications setting is not among the protected settings. Apple thus built its strongest protection against a passcode-holding adversary on the assumption that home is safe, the very assumption the National Network to End Domestic Violence warned Apple against in April 2021 when it asked Apple to design for "the person you come home to every day." Extending biometric step-up protection to the safety-alert settings, or notifying the



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

account holder by email or other channel when safety alerts are turned off, was feasible at negligible cost.

74. **Courts Have Already Found These Alert Defects Adequately Pleaded.** Plaintiffs in prior litigation repeatedly reported receiving Apple's alert and not understanding it, or receiving it once and never again, and the court found those allegations sufficient to plead that the notification lacked clarity and that its delay and disappearance prolonged the stalking. *Hughes v. Apple, Inc.*, 723 F. Supp. 3d at 699, 707–08; *Hughes v. Apple, Inc.*, 2024 WL 4828072, at *5. Persistent or recurring alerts while co-travel continues, alert content stating the duration and locations of co-travel and that the user may be in danger, and a distinct alert class for the "borrowed item" case Apple already recognizes for Family Sharing were all feasible alternative designs.

75. **Alerts Were Limited to Updated iOS Devices and Safety Fixes Depend on the Stalker.** At launch, unwanted-tracking alerts were available only on iPhones, iPads and iPod Touches running iOS 14.5 or later, leaving users of older software with no protection. Several of Apple's later safety improvements, including Precision Finding for a person who receives an alert, were delivered through AirTag firmware updates that install only when the AirTag's owner brings it within range of his own iPhone. The person the update is meant to thwart controls whether it is ever installed. Over-the-air delivery of safety firmware through any relaying Find My device was feasible.

76. **No Remote Disablement Even When Apple Confirms the Tracking.** Apple will not disable an AirTag remotely even when a non-owner reports it and Apple confirms, through its own alert, that the device is travelling with her. Apple has told victims it is unable to disable a tag without physical possession. A victim who cannot find the device—because it is



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

sewn into upholstery, muffled, or silenced—remains tracked indefinitely. Remote disablement by Apple of an AirTag it has confirmed is moving with a non-owner who reports it was a feasible alternative design.

77. **Apple's Pattern: the Minimum, After the Harm.** Each improvement Apple has made came after documented harm, press coverage, or litigation, and each addressed the narrowest version of the problem: a 72-hour alert delay at launch, shortened only in February 2022; a manual-scan Android app in December 2021, then nearly two years of inaction until Google built operating-system alerts; a public promise in April 2024 of unspecified future changes; and a louder, tamper-resistant speaker only in January 2026, nearly five years after modified "silent AirTags" went on sale. At no point has Apple changed the wording of the alert to convey danger, made the alert persist or recur while tracking continues, allowed an iPhone user to scan on demand, protected the alert settings from the abuser the product most often serves, or disabled a confirmed tracker remotely. Apple's later changes are pleaded as evidence of the feasibility of safer designs and of Apple's knowledge.

78. **The Multi-Year Cross-Platform Security Void.** Defendant Apple defectively designed and marketed the AirTag by restricting its automated, background anti-stalking protections almost exclusively to its own proprietary hardware and software ecosystem, thereby leaving the broad class of Android consumers disproportionately vulnerable to harm. To achieve any degree of protection, an Android user must either possess a modern, fully updated operating system or manually download Defendant's "Tracker Detect" utility application. This application is inadequate as a safety remedy because it lacks automated background functionality and functions only when a victim manually commands a scan. By forcing non-purchasers to proactively predict their own victimization to activate a safety feature, Apple has distributed a


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

product that is inherently dangerous to the general public and entirely fails to provide necessary, cross-platform safety warnings.


Check for AirTags or Find My accessories using an Android device

See the Find Unknown Trackers support page for more information on how to check for unwanted tracking on Android devices.

Fig. 8




Fig. 9

79. **Inadequacy of the "Tracker Detect" Manual Software Remediation.** The "Tracker Detect" mobile application that Apple eventually released for Android users in December 2021 was an exercise in fulfilling safety obligations to the minimum extent possible. Unlike the passive, "always-on" background automated protection granted natively to iOS users, Tracker Detect was engineered with severe structural defects. The application completely lacked background execution capabilities and could not issue passive, automated push notifications. Instead, an Android user was forced to actively suspect they were being stalked, manually



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

download the application, and affirmatively initiate a localized scan. If an individual lacked technical literacy, remained unaware of the AirTag's commercial existence, or did not actively suspect a tracking device was present, Apple's ecosystem permitted them to be tracked indefinitely without warning. By shifting the burden of active surveillance detection entirely onto an un-warned public, Apple's manual application failed to offer a meaningful cure.

80. **Inherent Limits of the Delayed Industry Standard Realignment.** While Apple and Google published a joint industry specification for unwanted-tracking alerts in May 2023, and Google deployed automatic Android alerts for AirTags in July 2023, this delayed realignment came far too late to protect the public from foreseeable injuries, and came only after Google had informed Apple in March 2022 that background scanning was feasible and Apple had declined to implement it because it "would negatively impact battery life." For more than two full years post-launch, Apple continued to profit from a cheap, easily concealed tracking device while leaving the Android user base exposed to an unmitigated threat of violence and severe psychological distress. Furthermore, this post-hoc cross-platform update remains functionally inadequate because it continues to rely on the same defective diagnostic latencies and geographic filtering blind spots that compromise Apple's native software architecture, leaving non-consensual tracking targets continuously vulnerable to real-time surveillance.

81. **Apple Claimed Patent Rights Over the Industry's Anti-Stalking Standard.** Even when Apple finally joined Google in proposing a cross-platform standard, it did so on terms that served its own commercial interest. In May 2023, Google and Apple jointly submitted a proposed industry specification to make Bluetooth location trackers compatible with unwanted-



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

tracking detection and alerts across Android and iOS.[53] Apple then lodged patent disclosures in the standards process asserting that it holds patents covering the specification—notice to competitors and the public that Apple could later demand royalties from, or sue, anyone who implements the anti-stalking standard.[54] The Electronic Frontier Foundation observed that Apple stood alone among the participants in the standards process—which included Samsung, Google, Mozilla, and other patent holders—in reserving intellectual-property rights over technology meant to help people avoid being secretly tracked, and called on Apple to withdraw its disclosures and commit not to assert patent claims against companies or users seeking protection from surreptitious tracking.[55] By reserving the right to charge for, or litigate over, the use of anti-stalking technology, Apple discouraged other manufacturers and platforms from adopting the very protections it claimed were necessary to keep people safe, and placed its potential licensing revenue ahead of the safety of the people its product was being used to track.

82. **Insufficient and Easily Defeated Audible Alerts.** Defendant Apple's hardware architecture incorporates a severe physical design defect by relying on an inherently insufficient and easily defeated acoustic warning system. When an AirTag is separated from its pairing device for an extended duration, it is programmed to emit an audible chime. However, the physical hardware's integrated piezoelectric speaker maxes out at a mere 60 decibels. This acoustic volume is easily muffled, obscured, or rendered entirely silent when the token is tucked behind a vehicle's license plate, placed inside a wheel well, or wrapped in standard fabric linings.

---

[53] *Google and Apple Lead Initiative for an Industry Specification to Address Unwanted Tracking*, GOOGLE SECURITY BLOG (May 2, 2023), https://security.googleblog.com/2023/05/google-and-apple-lead-initiative-for.html.
[54] Alexis Hancock & Eva Galperin, *The Industry Discussion About Standards for Bluetooth-Enabled Physical Trackers Is Finally Getting Started*, ELECTRONIC FRONTIER FOUNDATION (Aug. 14, 2023), https://www.eff.org/deeplinks/2023/08/industry-discussion-about-standards-bluetooth-enabled-physical-trackers-finally.
[55] *Id.*


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

Furthermore, the specific frequency of the chime is virtually indistinguishable from ordinary ambient electronic device notifications. Most critically, the physical casing was engineered in a manner that permits bad actors to effortlessly execute a foreseeable modification: following basic online tutorials, a stalker can pry open the plastic shell and permanently remove the internal speaker coil. By commercializing a hardware design that is easily converted into a completely "silent AirTag," Apple manufactured a product uniquely optimized for total, permanent concealment.

83. **Forced Evidentiary Contamination and Adversarial Stalker Notification**. Defendant Apple's hardware architecture incorporates a further design defect by forcing non-consensual tracking targets into a dangerous, no-win dilemma that directly escalates the risk of physical violence and compromises criminal investigations. If a target manages to navigate Apple's notification delays and successfully uncovers a hidden AirTag, the ecosystem offers no software-based mechanism or administrative interface to digitally deactivate the surveillance tracking grid. Instead, Apple's physical design requires the victim to manually twist off the structural metal battery enclosure to cut power to the device. This mandatory physical maneuver triggers two immediate, hazardous consequences. First, the physical handling required to disassemble the compact casing routinely obliterates or severely contaminates latent forensic physical evidence—such as fingerprints or touch DNA—rendering the hardware practically useless for subsequent law enforcement investigations. Second, the sudden cessation of localized telemetry transmission instantly pings the stalker's pairing interface that the device has been compromised. By immediately alerting a potentially volatile abuser to the exact moment of discovery, Apple's defective deactivation design stripped away a victim's safety, directly precipitating dangerous, real-time physical confrontations and retaliatory violence.


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

84. **The 25-Day Data Retention Defect.** Defendant Apple further compromised public safety by engineering an intentional, severely restrictive internal data retention protocol within the Find My infrastructure that systematically destroys vital criminal evidence. While Apple publicly reassures consumers and judicial bodies that it actively cooperates with law enforcement to identify rogue trackers, Apple's uniform corporate policy dictates that AirTag pairing history logs are automatically purged and permanently deleted after a maximum window of only 25 days.[56] This architectural data-destruction policy applies universally, rendering historical pairing telemetry completely unavailable even when municipal law enforcement or federal prosecutors present a valid criminal search warrant or judicial subpoena. By design, once this narrow 25-day threshold expires, Apple's systems permanently sever the digital link connecting the physical hardware token to the perpetrator's Apple ID.

85. **The "Ticking Clock" Trap and Algorithmic Blind Spots.** This 25-day data-purging architecture incorporates multiple catastrophic design flaws that directly subvert victim safety. First, it completely ignores the documented, long-term nature of intimate-partner violence, which routinely involves non-consensual tracking campaigns enduring for months. If an abuser pairs a device and executes a surveillance campaign lasting 30, 60, or 90 days, Apple's system actively erases the foundational pairing record while the crime is still actively occurring. Second, this rapid deletion protocol operates in tandem with Apple's inherent software alert latencies and its historical failure to provide background Android protections. Because Apple's own design flaws delay the discovery of a rogue AirTag for days or weeks, the product's architecture ensures that a substantial portion of the narrow 25-day

---

[56] *See Legal Process Guidelines (U.S.)*, Apple Inc., § III(N) ("AirTag and Find My Network Accessory Program"), https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf (explicitly stating: "AirTag pairing history is available for a period up to 25 days.").


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

evidence-preservation window is completely exhausted before a target even realizes they are being targeted.

86. **Foreseeable Bureaucratic Latency and Intentional Protective Asymmetry.** Apple engineered this rapid data-purge mechanism with full corporate knowledge that the legal process required to secure digital evidence moves slowly. In municipal police departments and local county jurisdictions, the administrative chain of custody required for an overburdened detective to report a crime, draft an affidavit, secure a prosecutor's review, obtain a judge's physical signature on a search warrant, and formally serve Apple's corporate legal portal routinely and foreseeably exceeds 25 days. While Apple claims this rapid purge protects "owner privacy," it selectively retains consumer transactional data, retail histories, and software analytics for years to serve its own commercial benefit. By choosing to erase critical tracking records while preserving profit-driven data, Apple created an intentional protective asymmetry that prioritizes the anonymity of the stalker over the physical safety and rights of the victim, ensuring its hardware tokens function as highly optimized, untraceable tools for anonymous, long-term human surveillance.

## VII. APPLE'S KNOWING, CONTINUING FACILITATION OF STALKING THROUGH ITS FIND MY NETWORK

87. **Apple Does Not Merely Sell the AirTag; It Operates the Service That Tracks the Victim.** An AirTag has no GPS receiver, no cellular radio, and no internet connection of its own. It cannot track anyone unless Apple continuously provides the service that makes it work. Each time an AirTag hidden on a victim comes within Bluetooth range of any of the hundreds of millions of Apple devices Apple has enrolled in its Find My network, Apple's network generates a location report, transmits it to Apple's servers, stores it, and delivers it to the AirTag



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

owner's account, where Apple's Find My application displays the victim's location on a map. Apple performs that service around the clock, for as long as the AirTag's battery lasts, for every AirTag it has sold. Apple's role does not end at the point of sale; it is renewed every few minutes for the life of the device.

88. **Apple Knows When Its Network Is Being Used to Track a Person.** Apple has built software that allows it to alert others when its network is being used to track someone who is not the AirTag's owner. Each unwanted-tracking alert reflects a determination by Apple's own software that a particular AirTag, separated from the account to which it is registered, has been travelling with another person. Apple receives further notice through victims who contact Apple to report a tracker—and whom Apple has told it will not disable a tracker without physical possession, *see Hughes v. Apple, Inc.*, 723 F. Supp. 3d 693, 697 (N.D. Cal. 2024)—through law-enforcement requests and subpoenas identifying specific AirTags and their owners, and through the more than 40,000 tracking reports alleged above. Apple associates every AirTag with an identifiable owner account, and its own unwanted-tracking feature allows a person who finds an AirTag to retrieve a partial telephone number for that account.

89. **Apple Continues to Serve the Tracker After It Knows.** Having determined, through its own software, that an AirTag is travelling with a person who is not its owner, Apple does nothing to stop its network from continuing to deliver that person's location to the owner. Apple does not suspend location reports for an AirTag that has repeatedly triggered unwanted-tracking alerts or that a victim or law enforcement has reported; does not warn or suspend the owner's account; does not disable a tracker it has confirmed exists; and, rather than preserving the information needed to identify the person tracking the victim, purges AirTag pairing records within approximately 25 days. Each of these is a choice Apple makes in operating a live service



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

it controls, not a one-time decision made when the device was sold. Apple can stop delivering a victim's location to the person stalking her at any time, and chooses not to.

90. **Apple's Knowing Facilitation Bears on Duty, Causation, and Punishment.** Apple's continuing, knowing provision of real-time location services to people it has reason to know are using them to track non-consenting victims is affirmative conduct, not passive inaction. It is why Apple, in operating the Find My network, "put the danger in play" and owes a duty of care to the people its network is used to track, *see Hughes*, 723 F. Supp. 3d at 703–04; Restatement (Second) of Torts §§ 302B, 449; why a stalker's use of Apple's service is the very risk Apple's conduct creates, rather than a superseding cause; and why Apple's conduct reflects a conscious disregard of the safety of others warranting punitive damages.

## PLAINTIFF'S SPECIFIC FACTUAL ALLEGATIONS

91. **The relationship.** Plaintiff is married to Sai Kishore Kommuri ("the Husband"), the father of her two young children, a son then aged three and a daughter then aged 5. Plaintiff also has an adult daughter from a prior marriage. The Husband holds an upper-management position in the [cybersecurity] organization of a major telecommunications company and is technically sophisticated. Throughout the marriage the Husband had access to Plaintiff's passwords and PINs, including the passcode to her iPhone.

92. **Escalating abuse.** Over the months preceding October 2024, the Husband's abuse of Plaintiff grew progressively worse. He grabbed her by the arms hard enough to bruise her, pushed her into walls, put his fist through a wall, and threw objects at her, breaking two televisions. He used doors, furniture, backpacks, televisions and heaters to throw at her and to push, pull or slam into her body. On two occasions he forced her onto the bed, pulled off her clothes and had sex with her without her consent. He drove at high speed with Plaintiff in the



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

car, saying he did not care if they died. He withheld finances from her, locked her out of three rooms of the family home, took her wallet, passport, driver's license and bank cards and told her she had misplaced them, and lied to the children about her. Much of this abuse occurred in front of the children. He told her that if she ever left him, he would make her life "a living hell."

93. **Surveillance as a tool of control.** Throughout this period the Husband used Apple AirTags to keep Plaintiff under constant surveillance, so that she understood she could not get away from him. He placed trackers on Plaintiff on at least three separate occasions.

94. **The first AirTag (May 2024).** In or about May 2024 Plaintiff travelled out of state to visit her parents, accompanied by her adult daughter and her son. Her adult daughter found an AirTag hidden in the son's diaper bag. Plaintiff's iPhone had given her no alert that an AirTag was travelling with her, and she does not know how long the AirTag had been in the diaper bag before it was found. Apple's records will show when, if ever, Plaintiff's iPhone detected that AirTag and why no alert was delivered.

95. **No alerts, because the Husband turned them off.** Plaintiff received no unwanted-tracking alert from her own iPhone during any of the three episodes described here. The Husband, using his access to Plaintiff's iPhone and knowledge of her passcode, routinely turned off the notifications that would have warned her. iOS required no biometric confirmation and gave Plaintiff no notice that her safety alerts had been disabled. Plaintiff learned of the tracking only when other people's phones alerted them.

96. **The second AirTag (July 2024).** At the end of July 2024 Plaintiff was driving her car with her adult son and her adult daughter when her adult children's phones displayed an alert that an AirTag was following them. Plaintiff's own iPhone did not. They pulled over and searched but could not find the device that evening. They eventually found the AirTag hidden



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

inside the upholstery of the rear seat of Plaintiff's car; the Husband had broken the seat open to place it inside. When Plaintiff confronted the Husband by text about the AirTag he responded that he was "protecting his property."

97. **The third AirTag (August 2024).** In or about August 2024 Plaintiff planned to meet an out-of-town friend. Because of tension in the home, they arranged to meet elsewhere, and Plaintiff borrowed the Husband's car to travel for several days with both children to Oregon. The Husband placed an AirTag in the console of that car. Plaintiff discovered it only when her friend's phone alerted the friend to an unknown AirTag travelling with them. The friend, whose husband is an emergency responder and had warned her about trackers, was too frightened to return to the hotel where they were staying. When Plaintiff confronted the Husband he again said he was "protecting his property" by keeping an AirTag in the car.

98. **Fear for her life.** On Plaintiff's return the Husband abruptly became affectionate and proposed a family trip to a national park. Plaintiff, by then terrorized by months of violence and surveillance, concluded he intended to kill her on the trip. She wrote a letter to that effect and left it in a safe for her adult daughter to find if she did not return. She had, by this point, lost her will to live.

99. **The stairs incident and the protection order (October 2024).** As soon as the family returned from their trip to a national park, the Husband resumed his abuse. On the morning of October 4, 2024, while the family was getting ready for work and school, the Husband aggressively pushed Plaintiff and the children. Plaintiff's young daughter stayed close to her, explaining that "Daddy won't hurt you if I'm near you." Moments later Plaintiff heard screaming from outside: the Husband had pushed her three-year-old son down the stairs. When Plaintiff told him to get away from the children and leave the house, he told her, "You are going



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

to die in a bad way." He refused to leave. The week before, he had told her that if she did not do everything he asked he would "expose" her to everyone and ruin her son's wedding.

100. That day Plaintiff petitioned the Kitsap County Superior Court for a domestic-violence protection order for herself and both children, describing the violence, the forced sex, the threats, and the trackers he had put on her vehicles. The court entered a Temporary Protection Order and an Order to Surrender and Prohibit Weapons the same day. On November 14, 2024, after a hearing at which the Husband appeared with counsel, the court entered a one-year Domestic Violence Protection Order finding that the Husband represented a credible threat to the physical safety of Plaintiff and the children. The order prohibited him from harming, contacting, or stalking Plaintiff and the children, expressly prohibited him from keeping Plaintiff under "physical or electronic surveillance" or using electronic means to "track locations," excluded him from within 1,000 feet of Plaintiff, her vehicle, her residence and the children's school, required him to vacate the family residence and surrender weapons, granted Plaintiff temporary custody, and limited him to supervised visitation.

101. **Apple's Network Detected the Husband's AirTags and Kept Serving Him.** From at least May through October 2024, Apple's Find My network relayed Plaintiff's location—and, through the AirTag in the diaper bag, her young son's—to the Husband's account. On at least two occasions Apple's own software, running on the phones of Plaintiff's adult children and her friend, determined that an AirTag registered to the Husband's account was travelling with people who were not its owner and issued alerts to them. Apple did nothing with those determinations: it did not suspend the location reports, warn or restrict the Husband's account, or take any other step, and its network continued to deliver Plaintiff's location to the Husband.



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

102. **Causation.** Had Apple's alert system fired on Plaintiff's own iPhone when the first AirTag began travelling with her, stated that she was at risk, recurred while the tracking continued, or been protected from being switched off by the person who was tracking her, Plaintiff would have discovered the surveillance months earlier than she did, would have understood its significance, and would have sought protection before the violence, forced sex, and threats of the summer and autumn of 2024. The Husband's use of the AirTag was the very risk that made Apple's design unreasonably dangerous and was not a superseding cause. The length of time Plaintiff was tracked before any functioning alert, and the state of the alert settings on her device, are within Apple's knowledge. Independently, had Apple stopped delivering location reports from the Husband's AirTags once its own software detected them travelling with people other than their owner, the Husband would have lost the ability to follow Plaintiff months before she obtained a protection order.

103. **Injuries.** As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe emotional distress with objective physical symptoms, including persistent fear and hypervigilance, sleep disturbance, excessive worry, and inability to socialize or maintain normal social interactions. Her work serving unhoused clients and people in recovery or with serious mental illness was compromised, and she and her clients were put at risk while her location was exposed, leading to the loss of her job. She has incurred attorney fees of over $60,000 and has recently had to begin representing herself because she can no longer afford legal representation, putting herself and her children at further risk. In addition, she has incurred medical expenses as a result of the Husband's termination of her medical insurance. She has had to change the locks at her house. She remains in a contentious dissolution proceeding in



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

which the Husband continues to exhaust her financially, and she continues to fear for her safety and the safety of her children.

## CLAIMS FOR RELIEF

### First Claim for Relief

### Design Defect under the Washington Product Liability Act (WPLA) (RCW 7.72.030(1)(a))

104. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

105. Defendant Apple is a "manufacturer" within the meaning of RCW 7.72.010(2) because it engages in the design, engineering, production, marketing, and distribution of the AirTag hardware device and the accompanying "Find My" network infrastructure in the regular course of its commercial business.

106. Under the risk-utility test set forth in RCW 7.72.030(1)(a), a product is defectively designed if the likelihood that the product would cause the claimant's harm, and the seriousness of that harm, outweighed the burden on the manufacturer to design a product that would have prevented the harm and outweighed the adverse effects, if any, of such alternative design on the utility of the product.

107. The AirTag and "Find My" network ecosystem are defectively designed because Apple engineered a hyper-compact tracking device uniquely optimized for covert concealment, built without adequate, real-time safety buffers, and powered by a unilaterally force-enrolled global network of over one billion background consumer devices acting as involuntary surveillance relays.

108. The dangerous physical and structural design defects of the tracking ecosystem manifest an unreasonable risk of severe, foreseeable harm. These specific defects include, but



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

are not limited to: (*i*) a low-decibel, easily muffled, and easily removable piezoelectric speaker; (*ii*) an excessive three-day algorithmic notification latency window that actively insulated stalkers from early detection; (*iii*) a total failure to provide automated cross-platform background scanning at the time of launch; (*iv*) the suppression of alerts around "Significant Locations"; (*v*) its total denial of manual scanning validation tools for iOS users; and (*vi*) a premature 25-day automated data-purge.

109. At all relevant times, feasible, safer alternative designs were technologically and commercially available to Apple that would have mitigated or entirely prevented the injuries suffered by Plaintiff without destroying the product's core utility. These alternatives include, but are not limited to:

- Implementing automated, real-time, cross-platform background safety alerts at the initial point of market distribution;
- Engineering a secure, integrated hardware casing that prevented the effortless removal or disabling of the internal speaker wire;
- Eliminating alert-suppression filters around private residences and "Significant Locations" for unowned devices;
- Providing functional, automated manual-scanning verification applications across all mobile operating systems;
- Extending internal data-retention logs to accommodate foreseeable law enforcement search warrant delays; and
- Suspending, on Apple's own servers, delivery of location reports to the owner of any AirTag that Apple's software has repeatedly detected travelling with a person who is not its owner, or that a non-owner or law enforcement has reported, unless and until the owner verifies that the AirTag is not being used to track a person.

110. The AirTag's design is not limited to its hardware. Apple designed, and after sale continues to operate and control, the server-side Find My infrastructure on which the AirTag's tracking function depends, including the rules that determine whether location reports continue


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

to be delivered after Apple's own software has detected that an AirTag is tracking a non-owner. A design that continues to deliver a victim's location to her stalker after Apple's system has identified the tracking is not reasonably safe.

111. As a direct and proximate result of Defendant Apple's manufacturing, commercializing, and distributing a product in an unreasonably dangerous and defectively designed condition, a third-party bad actor was able to seamlessly weaponize the device to track Plaintiff without consent. Consequently, Plaintiff was subjected to prolonged, undetected surveillance, sustaining severe emotional distress, significant financial damages, acute mental trauma, and a profound loss of personal safety.

## Second Claim for Relief

### Failure to Warn, Including Post-Manufacture Duty to Warn, under the Washington Product Liability Act (WPLA) (RCW 7.72.030(1)(b) and (1)(c))

112. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

113. Under RCW 7.72.030(1)(b), a product is not reasonably safe if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate, and the manufacturer could have provided adequate warnings or instructions.

114. Defendant Apple introduced the AirTag and the accompanying "Find My" infrastructure into trade and commerce in an unreasonably dangerous condition because it completely lacked adequate safety warnings and instructional safeguards directed at both purchasing consumers and predictable, non-consensual tracking targets. Specifically, Apple failed to provide any conspicuous pre-purchase disclosure or operational warning regarding the



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

ease with which the hardware casing could be covertly concealed, the simplicity with which its internal speaker could be permanently removed, or the multi-day notification latencies that would leave targets entirely blind to real-time surveillance.

115. Prior to placing the tracking ecosystem into the stream of commerce, Defendant Apple knew or, in the exercise of reasonable care as a prudent manufacturer, should have known of the severe risks of illicit tracking, predatory harassment, and domestic stalking. Apple received explicit, pre-production warnings from national domestic violence coalitions, cybersecurity researchers, and privacy advocates detailing exactly how the product would be weaponized against vulnerable populations. Despite this actual corporate knowledge, Apple chose to ignore these threats and actively marketed the device as a safe, benign lifestyle accessory, completely failing to provide instructions on how a target could detect, scan for, or safely disable a rogue beacon.

116. Independently, under RCW 7.72.030(1)(c) a product is not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured where the manufacturer learned, or a reasonably prudent manufacturer should have learned, of a danger connected with the product after it was manufactured. Within days of launch, and continuously thereafter, Apple learned from advocates, journalists, law enforcement, and more than 40,000 tracking reports that the AirTag was being used to stalk intimate partners, that its alerts were delayed, unclear and non-recurring, that its speaker was being disabled, and that alerts could be switched off from the victim's own phone. A reasonably prudent manufacturer would have acted promptly to warn and instruct foreseeable victims—through the alert itself and otherwise—of these dangers and of how to detect and respond to a hidden tracker. Apple instead



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

issued piecemeal, delayed and inadequate changes, as alleged above, and never warned users that their safety alerts could be disabled by anyone with access to their phone.

117. As a direct and proximate result of Defendant Apple's failure to provide adequate and immediate safety warnings and instructions, Plaintiff was left defenseless against covert surveillance. This lack of adequate warning directly caused Plaintiff to be subjected to extended non-consensual tracking, forcing Plaintiff to suffer severe mental trauma, acute emotional distress, perpetual fear, and out-of-pocket mitigation expenses.

## Third Claim for Relief

### Violation of the Washington Consumer Protection Act (CPA) (RCW 19.86.020, et seq.)

118. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

119. The Washington Consumer Protection Act (CPA) declares unlawful any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" RCW 19.86.020.

120. Defendant Apple engaged in unfair and deceptive acts and practices in the conduct of trade and commerce by marketing, distributing, and operating the AirTag and the accompanying "Find My" infrastructure as a safe, highly secure, and benign consumer lifestyle utility, including through its coordinated campaign, alleged above, to present the AirTag to the public as "stalker-proof." In doing so, Apple actively and deceptively suppressed, concealed, and omitted material safety defects, including the platform's multi-hour notification latencies, its total lack of automated background scanning protections for the massive Android ecosystem, the suppression of alerts at "Significant Locations," and the ease with which its acoustic physical speaker could be permanently removed. Apple's conduct is further "unfair" because it offends



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

deeply rooted public policies protecting personal privacy and safety and utilizes a force-enrollment architecture that inflicts substantial, unavoidable injuries upon an unaware public.

121. Defendant Apple's unfair and deceptive corporate practices occurred directly within the stream of trade or commerce. Apple's conduct extensively impacts public interest because its tracking network operates globally across hundreds of millions of devices, directly affecting the safety of residents within the State of Washington, and possesses the clear capacity to deceive substantial segments of the public regarding the actual stalking and surveillance risks inherent to the technology.

122. As a direct and proximate result of Defendant Apple's unfair business practices, deceptive omissions, and exploitative network architecture, Plaintiff sustained concrete injury to her business and property within the meaning of RCW 19.86.090, including lost income from her work, out-of-pocket costs of inspecting her vehicles and replacing or securing devices, and attorney's fees incurred in the protection-order proceedings attributable to the tracking.

123. Pursuant to RCW 19.86.090, Plaintiff is a "person" who has been injured in her property by a violation of RCW 19.86.020, and is therefore entitled to a judicial order enjoining Apple's unfair practices, and a judgment recovering her actual financial damages, equitable restitution, statutory treble damages up to the maximum limit authorized by law, and an award of reasonable attorneys' fees, expert witness fees, and litigation costs.

## <u>Fourth Claim for Relief</u>

## Common Law Negligence

124. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

125. The WPLA's design-defect standard incorporates a negligence inquiry: whether the likelihood and seriousness of the harm outweighed the burden of a safer design. To the extent any aspect of Apple's conduct alleged here—including its operation of the Find My network, its post-sale conduct, and its data-retention and law-enforcement practices—is not product-caused harm within the WPLA, Defendant Apple owed Plaintiff a duty to exercise reasonable care in the design, marketing, manufacturing, and distribution of AirTags in a manner that avoids creating an unreasonable, foreseeable risk of harm to people, such as Plaintiff.

126. Apple's duty also arises from its own affirmative, continuing conduct. A defendant whose affirmative act creates or increases a recognizable risk of harm through the criminal conduct of a third party owes a duty to guard against that risk. Restatement (Second) of Torts § 302B & cmt. e; *Robb v. City of Seattle*, 176 Wn.2d 427, 295 P.3d 212 (2013); *Parrilla v. King County*, 138 Wn. App. 427, 157 P.3d 879 (2007). Apple does not stand by while third parties misuse its product: it operates, every minute, the network that delivers a victim's location to the person tracking her, and it continues to do so after its own software has detected that the AirTag is travelling with someone who is not its owner. That continuing provision of service is misfeasance, not nonfeasance.

127. Defendant Apple breached its duty of care to the public, and to Plaintiff specifically, by continuing to operate, maintain, and expand a global surveillance grid of unprecedented density without implementing adequate security gates or automated cross-platform protections. Apple maintained this dangerous operational stance despite receiving a cascading volume of actual notice confirming that its network infrastructure was actively being leveraged as a turnkey system for predatory stalking, car theft, and domestic abuse.


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

128. Apple further breached its duty by continuing to deliver location reports from AirTags that its own software had identified as travelling with non-owners, including the AirTags tracking Plaintiff, without suspending those reports, warning or restricting the owner's account, or preserving the records needed to identify the person tracking her.

129. Defendant Apple further breached its common-law duties by failing to take reasonable, timely post-sale remedial measures, failing to implement automated background scanning tools for all vulnerable mobile operating systems at launch, and maintaining an intentional 25-day data retention protocol that it knew would actively wipe critical evidence before law enforcement agencies could legally subpoena the data to identify and halt active stalkers.

130. As a direct and proximate result of Defendant Apple's operational negligence, post-sale omissions, and failure to exercise reasonable care as a network administrator, an illicit perpetrator was enabled to continuously exploit the "Find My" network grid to surveil Plaintiff. Apple's ongoing breaches directly caused Plaintiff to sustain deep emotional trauma, acute anxiety, a total loss of personal security, and significant financial losses as described herein including but not limited to loss of her job, legal bills, medical bills and costs associated with her security such as changing her locks.

## Fifth Claim for Relief

### Punitive Damages under California Civil Code § 3294

131. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

132. As alleged in the Choice of Law section above, California law governs the punitive-damages issue regardless of which state's law governs liability. Under California Civil



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

Code § 3294, punitive damages are recoverable on clear and convincing evidence that the defendant acted with malice, oppression or fraud, including despicable conduct carried on with a willful and conscious disregard of the rights or safety of others.

133. Apple's conduct meets that standard. Apple was warned before launch, by name and in detail, that the AirTag would be used by abusers against the people they live with; responded by putting senior executives before the press in a coordinated campaign that presented the product as "stalker-proof"; acknowledged internally that its safeguards would "deter as opposed to prevent" misuse; received more than 40,000 tracking reports; declined Google's offer of background Android scanning on the ground of battery life; asserted patent rights over the industry's anti-stalking specification, as alleged above; and, five years on, has still not protected the one setting on which a victim's safety depends from the abuser who shares her home. Each safeguard Apple has adopted came only after harm, press or litigation, and each was the least that would quiet the criticism.

134. Apple's conduct is not confined to decisions made before sale. With knowledge—through its own detection software, victim reports, law-enforcement requests, and tens of thousands of tracking reports—that its network was being used to track specific non-consenting people, Apple has continued to deliver those people's locations to the people tracking them in real time, has refused to disable trackers it has confirmed exist, and has purged the records that would identify their stalkers. That is despicable conduct carried on with a willful and conscious disregard of the safety of others.

135. Plaintiff is entitled to punitive damages in an amount sufficient to punish Apple and deter it and others from similar conduct.



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

**<u>Sixth Claim for Relief—Pleaded in the Alternative</u>**

**Negligence and Strict Products Liability (Design Defect) under California Law; Violation of Cal. Bus. & Prof. Code § 17200**

136. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. This claim is pleaded in the alternative under Fed. R. Civ. P. 8(d)(2) and (3), solely in the event the Court determines that California law governs Plaintiff's claims.

137. *Negligence.* Under California Civil Code § 1714(a), Apple owed Plaintiff a duty to exercise reasonable care in the design, manufacture, marketing and sale of the AirTag and the iOS alert system to avoid exposing foreseeable victims to an unreasonable risk of harm through the foreseeable conduct of third parties. The *Rowland* factors do not support an exception to that duty. *Hughes v. Apple, Inc.*, 723 F. Supp. 3d 693, 700–06 (N.D. Cal. 2024). Apple breached that duty as alleged above, and its breach was a substantial factor in causing Plaintiff's injuries; the Husband's conduct was the very risk that made Apple's design negligent and was not a superseding cause. *Id.* at 706–07.

138. *Strict liability—design defect.* Apple designed, manufactured and sold the AirTag and designed the iOS alert system that is its only safeguard. The design embodied excessive preventable danger: its capacity for covert tracking of a person, combined with a warning system that is delayed, unclear, non-recurring, unprotected and defeatable, outweighs its benefits as an item-finder. The design was a substantial factor in causing Plaintiff's injuries. The burden therefore shifts to Apple to prove that the benefits of its design outweigh its risks in light of the feasibility and cost of the alternative designs alleged above. *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413 (1978); *Hughes*, 723 F. Supp. 3d at 711. Plaintiff is a foreseeable bystander within the protection of strict liability. *Elmore v. Am. Motors Corp.*, 70 Cal. 2d 578 (1969). Her emotional-



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

distress injuries are recoverable. *Hughes*, 723 F. Supp. 3d at 710 & n.7. Plaintiff does not plead the consumer-expectations test.

139. *UCL.* Apple's design and marketing of the AirTag occurred in California. Apple's conduct is unlawful, as constituting negligence and the sale of a defectively designed product, and unfair, because the harm to victims of AirTag stalking vastly outweighs any utility of the defective alert design and offends California's legislatively declared policies protecting personal privacy and prohibiting non-consensual tracking (Cal. Const. art. I, § 1; Cal. Penal Code §§ 637.7, 646.9). Plaintiff lost money or property as a result, including the items alleged in Plaintiff's Specific Factual Allegations above. Damages alone cannot afford complete relief because Apple continues to sell the AirTag with the defects alleged and Plaintiff, whose Husband continues to violate the protection order, remains at risk of being tracked; she lacks an adequate remedy at law for the continuing conduct and seeks injunctive relief requiring Apple to adopt the alternative designs alleged above, and restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendant Apple Inc. as follows:

(a) An award of actual, compensatory, and special damages in an amount to be proven at trial;

(b) An award of punitive damages under California Civil Code § 3294;

(c) An award of enhanced treble damages pursuant to the Washington Consumer Protection Act, RCW 19.86.090;

(d) An award of reasonable attorneys' fees, expert witness fees, and litigation costs pursuant to RCW 19.86.090 and other applicable law;

(e) An award of pre-judgment and post-judgment interest on all sums awarded, computed at the maximum legal rate from the date of injury until paid;



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT 06901
Telephone: (203) 325-4491

(f) An order granting permanent injunctive and equitable relief to restrain Defendant Apple Inc. from continuing its unfair and deceptive business practices under the Washington Consumer Protection Act and, in the alternative, the California Unfair Competition Law, including an order requiring Apple to adopt the alternative designs alleged herein, and restitution under the UCL; and

(g) Such other and further relief as this Court deems just, equitable, and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

Dated: October 27, 2026 Respectfully submitted,

*s/ Juli Farris*
Juli Farris, WSBA #17593
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
jfarris@kellerrohrback.com

Ian W. Sloss (*pro hac vice* forthcoming)
Jennifer Sclar (*pro hac vice* forthcoming)
Emily Golub (*pro hac vice* forthcoming)
Jennifer A. Williams (*pro hac vice* forthcoming)
**SILVER GOLUB & TEITELL LLP**
One Landmark Square, 15th floor
Stamford, CT 06901
Tel: (203) 325-4491
sclar@sgtlaw.com
egolub@sgtlaw.com
jwilliams@sgtlaw.com

*Attorneys for Plaintiff*